IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*v.*<br><br>ALVIN MARVIN DEMAR | Criminal Action No.<br><br>1:22-CR-404-ELR-JEM |

**Government's Post-Hearing Response in Opposition to
Defendant's Motion to Suppress Evidence from Automobile
and Defendant's Motion to Suppress Statements**

The United States of America, by Ryan K. Buchanan, United States Attorney, and Theodore S. Hertzberg, Assistant United States Attorney for the Northern District of Georgia, files this response in opposition to Defendant Alvin Marvin Demar's motions to suppress evidence (Doc. 22) and to suppress statements (Doc. 23).

## Procedural History

On November 8, 2022, a grand jury charged Defendant with possession of a firearm by a prohibited person. (Doc. 1). On May 19, 2023, Defendant filed the instant motions to suppress evidence and statements. (Docs. 22, 23).

On October 12, 2023, this Court held an evidentiary hearing on Defendant's motions and ordered the parties to file post-hearing briefs. (Doc. 30). Defendant filed his post-hearing brief on December 19, 2023. (Doc. 38).

## Statement of Facts

On December 7, 2019, Atlanta Police Department Officer ("Ofc.") Christopher Wade and his partner, Ofc. D. McHale, worked the night shift as uniformed patrol

officers. (Doc. 35 at 5-6).[1] At that point, Ofc. Wade had more than four and a half years of on-the-job experience as an Atlanta police officer. (*Id.* at 4-5).

Several minutes before 11:41 pm, while driving a marked police car with his window down, Ofc. Wade smelled the odor of burnt marijuana as he and his front passenger, Ofc. McHale, passed a line of cars. (*Id.* at 6, 10-11, 13, 20-22; Doc. 32-1 at 0:01 (Gov't Ex. 1 from evidentiary hearing)). Raw and burnt marijuana have different odors. (Doc. 35 at 34). Wade was familiar with both and could distinguish between them. (*Id.* at 14, 34-35). The smell of burning marijuana can linger in clothes or fabric or even in the air. (*Id.* at 35).

Ofcs. Wade and McHale believed the burnt marijuana odor emanated from a silver Chevrolet they had passed while traveling southbound on Boulevard towards Memorial Drive. (*Id.* at 22-24). Ofc. Wade turned his police car around and, within a matter of minutes, located a silver Chevrolet in a vacant lot at the northeast corner of Boulevard and Memorial Drive. (*Id.* at 12, 22-25).

Ofc. Wade believed the silver Chevrolet in the lot was the same silver Chevrolet that had emitted the burnt marijuana odor he smelled earlier. (*Id.*). Ofc. Wade pulled into the lot and got behind the silver Chevrolet. (*Id.* at 12, 25). He and Ofc. McHale stayed right behind the silver Chevrolet as it traveled northbound on Boulevard. (*Id.* at 12-13, 25). No other car was between the officers' car and the silver Chevrolet. (*Id.* at 12-13).

---

[1] Defendant's post-hearing brief referred to Ofc. Wade by his middle name, Blake, rather than his first name, Christopher. *Compare* Doc. 35 at 4 *with* Doc. 38 at 1. With respect to Ofc. McHale's name, the court reporter misheard Ofc. Wade, who testified his partner was "D. McHale," not "Dean McHale." (Doc. 35 at 6).

Thirty-three seconds after pulling out of the lot and onto Boulevard, Ofc. Wade activated his police car's lights to initiate a traffic stop of the silver Chevrolet. (*Id.* at 7-8; Doc. 32-1 at 1:27-2:00).[2] While they were following the Chevrolet, the officers

---

[2] In his post-hearing brief, Defendant claimed the police followed the Chevrolet "for almost a mile before pulling it over." (Doc. 38 at 3). In support, Defendant cited the following exchange from the evidentiary hearing:

> Q. You pulled in behind it?
> A. Correct. I pulled out northbound on Boulevard behind it.
> Q. And from that point until where you pulled it over -- and that was just -- that looked like it was just past the tunnel that goes under DeKalb Avenue; is that right?
> A. Yes, sir.
> Q. So that might have been -- how far is that, a mile -- three quarters of a mile from Memorial?
> A. Yeah, maybe just under a mile.

(Doc. 35 at 25-26).

Despite Ofc. Wade's willingness to accept defense counsel's suggestion that a mile or so separates Memorial Drive from the tunnel below DeKalb Avenue, the actual distance is significantly shorter. We know that because Ofc. Wade's body camera footage shows driving to the tunnel from the lot at the northeast corner of Boulevard and Memorial Drive took less than 50 seconds. (Doc. 32-1 at 1:27-2:15). To cover a mile in 50 seconds, one would have to hurtle down the road at a rate of 72 mph. The footage depicts intermittent speedometer readings between 25-30 mph. (*Id.* at 1:40-2:00). Also, Google Maps indicates the distance between the lot and tunnel is less than one-third of a mile. This Court can take judicial notice of such a geographic fact. Fed. R. Evid. 201; *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997) ("courts ordinarily take judicial notice" of "matters of geography"); *Todd v. Carstarphen*, 236 F. Supp. 3d 1311, 1320 n.14 (N.D. Ga. 2017) (relying on Google Maps to calculate distances and quoting Jeffrey Bellin & Andrew Guthrie Ferguson, *Trial by Google: Judicial Notice in the Information Age*, 108 Nw. U. L. Rev. 1137, 1162 (2014) ("Probably the most common online source of judicially noticed facts is Google Maps. . . . Courts often rely on Google Maps to establish the distance between two geographic points . . . referenced in the litigation.")).

again smelled burnt marijuana. (Doc. 35 at 26). Ofc. Wade also commented, "He's spraying the blunt." (*Id.* at 13; Doc. 32-1 at 2:33). Wade misspoke; he was going to say, "He's spraying the blunt spray in the vehicle," meaning air freshener to mask the smell of marijuana or other narcotic. (Doc. 35 at 13-14). At the time, all of the patrol car's windows were down. (*Id.* at 14-15). The Chevrolet's driver's window was also down. (*Id.* at 15).

After the Chevrolet stopped on the side of the road, Ofcs. Wade and McHale exited their police vehicle and approached the Chevrolet on foot. (*Id.*). Ofc. McHale smelled burning marijuana as he walked up to the car and while he stood next to the driver's side door. (*Id.* at 15-16). Ofc. Wade introduced himself to the driver, later identified as Defendant, and stated in a casual tone, "when we rolled by you a second ago and we were behind you, man, your car smells like weed." (Doc. 32-1 at 3:10-3:13). Defendant then stated, "Me and my wife had joints in the car." (*Id.* at 3:14-3:16; Doc. 35 at 15). Asked by Ofc. Wade whether Defendant had any marijuana in the Chevrolet, Defendant responded, "No, sir. We smoked it, sir." (Doc. 32-1 at 3:19-3:22). Additionally, while handing Ofc. Wade his driver's license, Defendant volunteered, "We had smoked. That's what I had do. We had smoked a -- I had a blunt we had smoked." (*Id.* at 3:34-3:38).

Ofc. Wade asked Defendant to "do [him] a favor" and step out of the car "just real quick, if you would." (*Id.* at 3:39-3:45). As Defendant was getting ready to exit the Chevrolet, Ofc. Wade asked him in a conversational manner what he had been spraying. (*Id.* at 3:48-3:49). Defendant responded, "blunt spray, sir." (*Id.* at 3:49-3:50; Doc. 35 at 16). Defendant then raised the driver's window, opened the

driver's door, stepped out of the Chevrolet, and closed the driver's door behind him. (Doc 32-1 at 3:52-4:01). Immediately, Ofc. Wade opened the door so he could speak with Defendant's wife, who was in the front passenger seat. (*Id.* at 4:02; Doc. 35 at 17). As he did so, Ofc. Wade saw a gun in the pocket of the driver's door. (Doc. 35 at 17). Subsequent investigation revealed the firearm was loaded and there was a round in the chamber. (*Id.* at 17-18).

Ofc. Wade asked Defendant's wife how she was doing and whether there was any more marijuana in the car. (Doc. 32-1 at 4:03-4:08). He then politely directed Defendant's wife to step out of the car and stand on the sidewalk. (*Id.* at 4:10-4:12). Ofc. Wade turned his attention back to Defendant and asked, "All right, sir, do you mind if I -- you mind if I check you?" (*Id.* at 4:13-4:15). Defendant then raised his arms, allowing Ofc. Wade to access his pockets. (*Id.* at 4:15). Ofc. Wade explained, "All right. I'm looking for weed, okay, 'cause we were smelling weed." (*Id.* at 4:15-4:17). While reaching into Defendant's pockets, Ofc. Wade said calmly, "You could've told me you had a gun in the door." (*Id.* at 4:30-4:31). Ofc. Wade then assured Defendant he was not under arrest: "Yeah, just relax, man. I'm not putting you in handcuffs or nothing like that. It's just weed, that's all it is." (*Id.* at 4:48-4:51).

As he walked away from the then-uncuffed Defendant to seize the firearm he saw, Ofc. Wade asked if Defendant had more weapons "or anything like that." (*Id.* at 4:52-4:53). After a short pause, Defendant said, "I do have a little marijuana in there," and he told Ofc. Wade that it was "in the middle part." (*Id.* at 4:58-5:02). While Ofc. McHale searched the center console of Defendant's car, Ofc. Wade

walked over to the driver's door and asked Defendant, "Is this your weapon?" Defendant replied, "Yes, sir." (*Id.* at 5:05-5:07).

Ofc. McHale looked through the center console, recovered a small amount of marijuana and a pill bottle, and asked Ofc. Wade for Defendant's name, which Ofc. Wade stated he did not yet know. (*Id.* at 5:08-5:20). Ofc. Wade then walked over to defendant at 11:46 pm, took out his handcuffs, and coolly explained that he was detaining Defendant temporarily:

> Okay, all right. Just 'cause you got a gun right here and there's weed right here, okay, just keep your hands just like they are, all right? You're not going to jail or anything like that. Just keep your hands where they're that.

(*Id.* at 5:22-5:28). From the sidewalk, Defendant's wife added, "You're just being detained," and Ofc. Wade confirmed, "You're just being detained real quick." (*Id.* at 5:28-5:30).

After handcuffing Defendant, Ofc. Wade walked towards the driver's door of the Chevrolet to retrieve the firearm. At 11:47 pm, Ofc. Wade asked Defendant, seemingly as an aside, "Have you ever been convicted of a felony?" (*Id.* at 5:38-5:39). Defendant replied, "Yes, sir." (*Id.* at 5:40).

Later, after Defendant had already admitted he was a convicted felon, Ofc. McHale informed Ofc. Wade of the discovery of suspected liquid codeine in Defendant's car. (*Id.* at 6:14-6:21). At 11:49 and 11:50 pm, Ofc. McHale told Ofc. Wade he also found Percocet pills and suspected ecstasy in the car. (*Id.* at 8:19-8:44, 9:08-9:10).

## Argument and Citation to Authority

### I. Ofc. Wade Stopped and Searched Defendant's Car Lawfully

#### 1. Ofc. Wade Testified Credibly, and He Reasonably Suspected Defendant's Car Emitted a Burnt Marijuana Odor While Behind It

In conclusory fashion, citing nothing, Defendant maintains "[i]t is simply not credible" that Ofc. Wade could have smelled marijuana when he drove past a line of cars while on patrol. (Doc. 38 at 6). Defendant mischaracterizes Ofc. Wade's testimony in a desperate effort to discredit the witness: Defendant contends Ofc. Wade was driving at a rate of 35 miles per hour when he passed the cars, but Ofc. Wade's actual testimony was that he was "not sure" how fast he was going and that he was "maybe" driving at 35. (Doc. 35 at 21-22). Ofc. Wade did not commit himself to a particular speed. To the contrary, Ofc. Wade demonstrated his carefully effort to testify accurately, nearly four years after the routine incident at issue. He admitted when he could not recall specific matters, and he did not wed himself to details of which he was not certain. Ofc. Wade used the word "maybe" four times and said "I'm not sure," "I can't remember," or "I don't remember" twelve times. In any event, Defendant offers no explanation for why Ofc. Wade would lie about having smelled marijuana while passing the line of cars, and he points to nothing about Ofc. Wade personally or the way in which Ofc. Wade testified to indicate deception or an inability to recall and convey events truthfully.

Thankfully, this Court observed Ofc. Wade on the witness stand and can evaluate his credibility based on its first-hand observations. "Credibility determinations are typically the province of the fact finder because the fact finder

7

personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002). In weighing the credibility of a witness, the court takes "into account the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand." *Id.* at 750. Applying those factors here, there is no reason to doubt Ofc. Wade's testimony. Ofc. Wade has no motive to lie, his testimony was internally consistent, and his demeanor was appropriate.

Ofc. Wade's testimony was not contrary to the laws of nature or so improbable that it cannot be accepted. Anyone who has passed a dead skunk on the highway—even with the windows raised, and even at high speed—understands that certain pungent odors travel well. Numerous courts have accepted testimony like Ofc. Wade's noting a patrol officer encountering a marijuana odor while passing or being passed by a vehicle. *See, e.g.*, *United States v. Moses*, No. 2:21-CR-160-1, 2023 WL 3408574, at *1 (W.D. Pa. May 12, 2023) ("when the Impala passed by Officer Hess, he detected a very strong odor of burnt marijuana emanating from the vehicle") *United States v. Herbin*, No. 1:19CR183-1, 2019 WL 6717779, at *1 (M.D.N.C. Dec. 10, 2019) (officer smelled marijuana while his vehicle was parked and a "passed by him and pulled into the lane in front of him to turn left"); *United States v. Reed*, No. 118CR00612KOBHNJ, 2019 WL 2710088, at *3 (N.D. Ala. May 3, 2019) ("Pinto testified he smelled the strong odor of raw marijuana when the officers' squad car passed the LeSabre."), *report and recommendation adopted*, No. 1:18-CR-612 KOB-HNJ, 2019 WL 2643909 (N.D. Ala. June 27, 2019); *United States v.*

*Theus*, No. 4:16-CR-40065-KES, 2017 WL 758490, at *1 (D.S.D. Feb. 27, 2017) ("Officer Winkel testified that as the Cadillac passed by him he immediately smelled the odor of burnt marijuana.").

Regardless, Defendant has fixated on a tangential part of Ofc. Wade's testimony. Even if Ofc. Wade had not smelled marijuana while passing a line of cars headed southbound on Boulevard—and even if Ofc. Wade could not identify which of the cars in the line was the source of the odor—it would not matter. Defendant has not challenged Ofc. Wade's testimony that, he smelled burnt marijuana when he later followed Defendant northbound on Boulevard without anything between his vehicle and Defendant's. A traffic stop must be based on probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with *Terry v. Ohio*, 392 U.S. 1 (1968), *see United States v. Spoerke*, 568 F.3d 1236, 1248 (11th Cir. 2009), but there is no constitutional significance to Ofc. Wade pulling behind and Defendant's car and following it for 33 seconds. Ofc. Wade lawfully restricted Defendant's liberty by initiating a traffic stop only after he confirmed the source of the marijuana odor.

> **2. The Odor of Burnt Marijuana Emanating from a Vehicle Provides Reasonable Suspicion for an Investigatory Stop and Probable Cause to Search the Vehicle, Notwithstanding Any Similarity Between the Odors of Marijuana and Hemp**

Numerous Eleventh Circuit cases hold that the odor of marijuana emanating from a vehicle establishes reasonable suspicion or probable cause for officers to stop and search the vehicle. *See, e.g.*, *Merricks v. Adkisson*, 785 F.3d 553, 560 n. 3 (11th Cir. 2015) ("the smell of burnt marijuana emanating from a vehicle is

9

sufficient probable cause to search a vehicle") (citing *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) (en banc) ("There is no doubt that the agent's suspicions rose to the level of probable cause when, as the door stood open, he detected what he knew from his law enforcement experience to be the odor of marijuana."))); *United States v. Hyppolite*, 609 F. App'x 597, 605 (11th Cir. 2015) ("We have held 'the recognizable smell of marijuana gives rise to probable cause supporting a warrantless search.'" (citations omitted)); *United States v. White*, 593 F.3d 1199, 1203 (11th Cir. 2010) ("the smell of marijuana alone may provide a basis for reasonable suspicion for further investigation of possible criminal conduct"); *United States v. Glen-Archila*, 677 F.2d 809, 813 (11th Cir. 1982) (noting that detection of marijuana odor "has been held to provide not merely reasonable suspicion but probable cause for a stop").

Defendant does not acknowledge these cases which defeat, if not foreclose, his argument. Instead, he implicitly argues they are inapposite because Ofc. Wade might have predicated the traffic stop on an odor of burnt hemp, which Defendant asserts is indistinguishable from burnt marijuana. Defendant's argument ignores that neither reasonable suspicion nor probable cause require absolute certainty and that every federal court to have been confronted with his argument has rejected it. *See, e.g.*, *United States v. Easley*, No. 23-CR-93 (KMM/DJF), 2023 WL 6938355, at *11 (D. Minn. Oct. 20, 2023) ("Trooper Mains did not need to develop absolute certainty as to whether he was smelling legal hemp or illegal marijuana to develop probable cause to believe he was smelling the latter."); *United States v. Harris*, No. 322CR00018FDWSCR, 2023 WL 5994638, at *6 (W.D.N.C. Sept. 15, 2023)

("[A] search based on the odor of marijuana—notwithstanding any similarity to the smell of legal hemp—does not negate a finding of probable cause because law enforcement's conduct must be reasonable under the circumstances and such reasonableness does not require conclusive proof that a defendant committed a crime."); *United States v. Holt*, No. 3:21-CR-80 (MPS), 2021 WL 5281366, at *4 (D. Conn. Nov. 12, 2021) ("[T]he mere possibility that a substance could be legal hemp does not undermine the reasonableness of the belief that such a substance is marijuana. . . . Thus, the legal status of hemp at the time of Holt's arrest offers little support for Holt's argument that Danaher's detection of an odor that he believed, based on his training and experience, to be that of marijuana did not provide a basis for reasonable suspicion . . . ."); *United States v. Vaughn*, 429 F. Supp. 3d 499, 510 (E.D. Tenn. 2019) ("Probable cause for a search warrant requires 'a fair probability, given the totality of the circumstances, that contraband or evidence will be found in a particular place.' Absolute certainty is not required. As a result, Defendants' contention that the smell could have been hemp does not change the fact that it also could be, and was, marijuana. The officers' detection of a marijuana odor meant there was a fair probability that marijuana would be found within the apartment, which is sufficient for probable cause.").

Indeed, even if the odors of legal hemp and illegal marijuana are indistinguishable (as Defendant claims without any evidence in the record), that serves to undermine, not bolster, his attack on the reasonableness of Ofc. Wade's suspicion. *See United States v. McCallister*, 39 F.4th 368, 375 (6th Cir. 2022) ("Nor is it compelling that the marijuana odor could have been a legal substance, like

11

hemp, instead of illegal marijuana. Reasonable suspicion, remember, does not require proof that the suspect committed a crime. And as McCallister concedes the odors of hemp (legal) and marijuana (illegal) are indistinguishable, the odor suggested at least a moderate chance that McCallister smoked marijuana." (citation omitted)).

## II. Ofc. Wade Did Not Obtain Defendant's Statements Illegally

Defendant's motion to suppress statements is a moving target. In his initial motion, Defendant moved to suppress "all custodial statements made by him" and cited *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Jackson v. Denno*, 378 U.S. 368 (1984), for the proposition that the Government must prove his statements were made voluntarily. (Doc. 23 at 2). The motion identified four statements made by Defendant: (1) he and his wife had smoked marijuana prior to the traffic stop, (2) there was marijuana inside his car; (3) the gun seized from the car was his; and (4) he was a convicted felon. (*Id.* at 1-2). In his post-hearing brief, Defendant said nothing about the first three of the four statements identified in the motion; the only statement referenced in the post-hearing was Defendant's admission that he was a convicted felon. Nonetheless, in the post-hearing brief, Defendant asserted that "[a]ll of Mr. Demar's statements were fruit of the automobile stop [and] . . . must be suppressed." (Doc. 38 at 11). Defendant also argued in the alternative that his "further statements" made "once the police handcuffed Mr. Demar and told him he was being detained" were obtained in violation of his Fifth Amendment right to remain silent. (*Id.* at 11-13).

12

Construed liberally, Defendant's argument now appears to be that the four statements identified in his motion should be suppressed as poisoned fruit of the traffic stop and only the fourth statement regarding his criminal history should be suppressed pursuant to *Miranda*. The argument fails on both scores.

First, because Defendant was lawfully detained and his vehicle was lawfully searched, his statements cannot constitute fruit of an unlawful seizure. *United States v. Lopez-Garcia*, 565 F.3d 1306, 1315 (11th Cir. 2009) (defendant's "fruit of the poisonous tree argument plainly collapses since . . . his Fourth Amendment rights were never violated").

Second, the Fifth Amendment and *Miranda* are not implicated here because Defendant had not been arrested and was not in custody when he made any of the challenged statements, let alone the statements he made before he was handcuffed regarding his use and possession of marijuana and his possession of a firearm.

In *Miranda*, the Supreme Court held that law enforcement officers must provide certain warnings prior to questioning "a person taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444). "[T]he freedom-of-movement test" lacks "talismanic power" and "identifies only a necessary and not a sufficient condition for *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 112-13 (2010) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984)). Accordingly, "[a]n officer's obligation to administer *Miranda* warnings attaches . . . 'only where there has been such a restriction on a person's freedom as to render him in custody.'" *Stansbury*, 511 U.S. at 321 (citation omitted).

13

The determination of whether a defendant was in custody "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Id.* at 323; *accord United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006). The objective factors to be considered include whether officers brandished weapons, touched the suspect, used language or a tone that indicated that compliance with the officers should be compelled, and the location and length of the detention. *United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010). "The reasonable person from whose perspective custody is defined is a reasonable innocent person." *Street*, 472 F.3d at 1309 (citation omitted).

Defendant's post-hearing argument wrongly conflates "detention" and "seizure" with arrest. (Doc. 38 at 11-12). Ofc. Wade detained Defendant, and Defendant was not free to leave, when Ofc. Wade handcuffed him immediately before Ofc. Wade asked if Defendant had been convicted of a felony. However, as the Eleventh Circuit has explained:

> [A]lthough a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment—and thus may be deemed to have been "seized" by law enforcement—he will not necessarily be considered in "custody" for Fifth Amendment purposes.
>
> Rather, "a free-to-leave inquiry reveals only whether the person questioned was seized." While "seizure is a necessary prerequisite to *Miranda*, a court must [also] ask whether a reasonable person would have understood his freedom of action to have been curtailed *to a degree associated with formal arrest*."

14

*Luna-Encinas*, 603 F.3d at 881 (citations and ellipses omitted; emphasis in original).

Simply because Defendant's liberty was restrained by the use of handcuffs during the traffic stop, Defendant's detention was not an arrest requiring *Miranda* warnings.³ *See, e.g.*, *United States v. Acosta*, 363 F.3d 1141, 1147 (11th Cir. 2004) ("an investigatory stop does not necessarily ripen into an arrest because an officer draws his weapon, handcuffs a suspect, orders a suspect to lie face down on the ground, or secures a suspect in the back of a patrol car"); *United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995) ("the fact that police handcuff the person or draw their weapons does not, as a matter of course, transform an investigatory detention into an arrest"). In this case, even as he was deploying the handcuffs, Ofc. Wade made clear Defendant was not being arrested. Ofc. Wade told

---

³ Ofc. Wade's decision to handcuff Defendant after discovering the firearm in Defendant's door pocket and before Defendant revealed that he was a convicted felon was appropriate. Officers "may take reasonable action, based upon the circumstances, to protect themselves during investigative detentions," and putting a person in handcuffs can be reasonable if it is "designed to provide for the safety of the agents." *United States v. Hastamorir*, 881 F.2d 1551, 1556-57 (11th Cir. 1989).

To suggest that Ofc. Wade deployed his handcuffs not for safety reasons but to arrest Defendant because he "had evidence that Mr. Demar had committed multiple felonies," Defendant's post-hearing brief misstated the timeline of events. (Doc. 38 at 3-4, 11-12). Ofc. Wade handcuffed Defendant before, not after, he learned that Defendant was a convicted felon, and before, not after, Ofc. McHale found suspected narcotics (other than a small quantity of marijuana) in Defendant's car. *See* Doc. 32-1 at 5:22-5:28 (handcuffing); *id.* at 5:38-5:40 (questioning); *id.* at 6:14-6:21) (conversation about liquid codeine); *id.* at 8:19-8:44, 9:08-9:10 (conversations about codeine, Percocets, and ecstasy). Only after Defendant revealed his criminal history was his arrest certain. (Doc. 35 at 34).

15

Defendant, "You're not going to jail or anything like that." (Doc. 32-1 at 5:26-5:27). Witnessing this, Defendant's wife understood Defendant was being detained, not arrested. (*Id.* at 5:28-5:29). Ofc. Wade agreed, and he emphasized the resulting seizure would be brief (assuming no change in circumstances), stating, "You're just being detained real quick." (*Id.* at 5:29-5:30).

The facts presented in this case are quite similar to those in *United States v. Parker*, No. 1:10-CR-0176-JEC-JFK, 2010 WL 5313758 (N.D. Ga. Nov. 18, 2010), *report and recommendation adopted*, 2010 WL 5313449 (N.D. Ga. Dec. 18, 2010). In *Parker*, police officers conducted a lawful *Terry* stop of a vehicle and removed the occupants. 2010 WL 5313758, at *2. As one of the occupants exited, an officer observed a handgun in the car. *Id.* The officer removed the defendant from the vehicle, handcuffed him, and told him he was being detained and was not under arrest. *Id.* Without Mirandizing the defendant first, the officer asked the defendant whether there were guns or drugs in the car. *Id.* During the questioning, the officer's weapon remained holstered, and the officer's tone of voice was "very laid back." *Id.* Citing *Luna-Encinas* and *Acosta*, the court held that the defendant was not subjected to custodial interrogation during the traffic stop and that statements made while he was handcuffed were admissible. *Id.* at *8-11. Based on similar facts and equally applicable law, this Court should reach the same result here.

## Conclusion

For the foregoing reasons, Defendant's motions to suppress evidence and statements should be denied.

Respectfully submitted,

RYAN K. BUCHANAN
   *United States Attorney*

/s/THEODORE S. HERTZBERG
   *Assistant United States Attorney*
Georgia Bar No. 718163
theodore.hertzberg@usdoj.gov